IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 3:16-cr-00495-HZ |
| Plaintiff, | OPINION & ORDER |
| v. | |
| MARY EVELYN AYALA, | |
| Defendant. | |

Billy Williams
UNITED STATES ATTORNEY
District of Oregon
Julia Jarrett
ASSISTANT UNITED STATES ATTORNEY
1000 SW Third Avenue, Suite 600
Portland, OR 97204

    Attorneys for Plaintiff

Whitney P. Boise
BOISE MATTHEWS LLP
1050 SW Sixth Avenue, Suite 1400
Portland OR 97204

    Attorney for Defendant

HERNÁNDEZ, District Judge:

Defendant was convicted of theft concerning programs receiving federal funds under 18 U.S.C. § 666; engaging in monetary transactions in criminally derived property under 18 U.S.C. § 1957; filing a false tax return under 26 U.S.C. § 7206; and failing to file an individual tax return under 26 U.S.C. § 7203. Now, the Government moves for a preliminary order of forfeiture. The Court grants in part and denies in part the Government's motion. The Court will enter a personal money judgment against Defendant in the amount of $1,025,235.33 and order the specific asset forfeiture of $364.01 and $451,006.95 as derived from proceeds traceable to her conviction under 18 U.S.C. § 666. It declines, however, to order substitute asset forfeiture at this time.[1]

## BACKGROUND

After an eight-day trial, a jury found Defendant guilty of five counts of theft concerning programs receiving federal funds; two counts of engaging in monetary transactions in criminally derived property; six counts of filing a false tax return; and one count of failing to file an individual tax return. Verdict Form, ECF 123. The Superseding Indictment included forfeiture allegations for Counts 1 to 5 under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); and Counts 7 and 8 under 18 U.S.C. § 982(a)(1). Sup. Indict., ECF 5. The Government also indicated that it would pursue substitute asset forfeiture under 21 U.S.C. § 853(p) as incorporated by 18 U.S.C. § 2323(b)(2)(A). *Id.* The Government submitted a Second Bill of Particulars specifying that it was seeking forfeiture of $364.01 from a bank account operated and controlled by

---

[1] Per the Government's request, the Court will apply the value of the specific property forfeited to the outstanding money judgment in the final order of forfeiture in order to avoid double counting. Gov't Mot. 13 n.5; *see also U.S. v. Ventura-Oliver*, Criminal No. 11-00503 JMS, 2014 WL 2712294, at *6 (D. Haw. June 13, 2014).

2 – OPINION & ORDER

Defendant and $451,006.95 from Fidelity National Title Co., previously belonging to MLK Property Group LLC, a business entity owned and operated by Defendant. Second Bill of Particulars, ECF 77. Defendant waived her right to a jury determination as to forfeiture. Min. Proceedings, ECF 120; Waiver Jury Determ., ECF 127.

Now, in its Motion for Entry of a Preliminary Order of Forfeiture, the Government seeks: (1) a money judgment of $1,071,425.95; (2) forfeiture of three specific assets, $364.01 and $451,006.95 as proceeds traceable to her conviction of Counts 1 to 5 and $20,000 as property traceable to a $20,000 check involved in Count 7; and (3), in the alternative, forfeiture of the specific assets as substitute property to fulfill any outstanding money judgment. Defendant opposes the personal money judgment, arguing that such judgments are no longer viable under the Supreme Court's decision in *Honeycutt v. United States,* 137 S.Ct. 1626 (2017). Defendant also opposes the Government's request for a money judgment and specific asset forfeiture by arguing that the Government did not properly deduct from the sought-after judgment bona fide expenses made in the usual course of business under 18 U.S.C. § 666(c).

## STANDARDS

If applicable, forfeiture is mandatory and imposed as punishment for a crime. *See United States v. Monsanto*, 491 U.S. 600, 606–07 (1989) (holding that, by using the phrase "shall order" in a criminal forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied"); *United States v. Davis*, 706 F.3d 1081, 1083 (9th Cir. 2013) (recognizing that "[f]orfeiture is imposed as punishment for a crime"). "When the government has met the requirements for criminal forfeiture, the district court must impose criminal forfeiture, subject only to statutory and constitutional limits." *United States v. Newman*, 659 F.3d 1235, 1240 (9th Cir. 2011) (citing *United States v. Casey*, 444 F.3d

1071, 1076 (9th Cir. 2006)). The government carries the burden of establishing facts warranting forfeiture by a preponderance of the evidence. *United States v. Christensen*, 828 F.3d 763, 822 (9th Cir. 2015). The government may seek criminal forfeiture in the form of: (1) an *in personam* money judgment against the defendant; (2) forfeiture of specific assets; and (3) forfeiture of substitute assets. *Newman*, 659 F.3d at 1242–43 (citing Fed. R. Crim. P. 32.2). Courts have unanimously agreed that *in personam* money judgments representing unlawful proceeds are proper even where forfeiture statutes do not refer to money judgments. *Id.* at 1242 (citing *United States v. McGinty*, 610 F.3d 1242, 1246 (10th Cir. 2010) (collecting cases)).

Before entering a preliminary order of forfeiture, "[i]f the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). Though there does not appear to be a Ninth Circuit test for determining whether there is the requisite nexus, "five other Circuits have adopted a but-for test: The Government must show that the defendant would not have obtained the property but for her illegal activity." *U.S. v. Martin*, No. 1:13-CR-0065-BLW, 2014 WL 221956, at * 4 (D. Idaho Jan. 21, 2014) (citing cases from the D.C. Circuit, the First Circuit, the Second Circuit, the Third Circuit, and the Seventh Circuit). "The court's determination may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B).

## DISCUSSION

Following Defendant's conviction, the Government seeks: (1) a money judgment of $1,071,425.95; (2) the forfeiture of specific assets, including $364.01 and $451,006.95 as

proceeds traceable to theft concerning programs receiving federal funds; and (3) in the alternative, forfeiture of the aforementioned specific assets as substitute property to fulfill any outstanding money judgment. Gov't Mot. Prelim. Order Forf. ("Gov't Mot.") 2, ECF 132. Defendant opposes the Government's request, arguing both that a personal money judgment is unlawful under the Supreme Court's decision in *Honeycutt v. United States* and that the judgment and specific asset forfeiture are not supported by the evidence adduced at trial. Def. Opp'n Gov't Mot. ("Def. Opp'n"), ECF 145.

This Court disagrees. First, the Court declines to depart from its previous decision in *United States v. Ford*, 296 F. Supp. 3d 1251 (D. Or. 2017), and finds that, after considering Defendant's bona fide health expenses paid in the usual course of business, a personal money judgment in the amount of $1,025,235.33 is proper in this case. Second, the Court finds that the funds from the sale of the MLK property are properly subject to specific asset forfeiture as the property was more likely than not purchased exclusively with proceeds of Defendant's crime. Finally, the Court declines to order the forfeiture of the funds from the sale of the MLK property as substitute property. Accordingly, the Court grants in part and denies in part the Government's motion for entry of a preliminary order of forfeiture.

## I. Money Judgment

The Government first seeks a personal money judgment of $1,071,425.95 as proceeds of Defendant's theft from GUTD under 18 U.S.C. § 666. "Federal Rule of Criminal Procedure 32.2 makes clear that, at least where the proceeds of the criminal activity are money, the government may seek a money judgment as a form of criminal forfeiture." *Newman,* 659 F.3d. at 1241 (citing Fed. R. Crim. P. 32.2(b)(1)(A)) ("If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay."). "The

calculation of [the] forfeiture amount does not demand mathematical exactitude[,] and the district courts are 'permitted to use general points of reference as a starting point . . . and may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding.'" *Ford*, 296 F. Supp. 3d at 1260 (quoting *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011)).

The statute at issue here permits forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" an offense under 18 U.S.C. § 666.[2] 18 U.S.C. § 981(a)(1)(C). Proceeds are "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A). Thus, "[t]he language of the forfeiture statute broadly makes forfeitable any property, obtained by the defendant directly or indirectly, as a result of the commission of" Defendant's crime. *See United States v. Lo,* 839 F.3d 777, 793 (9th Cir. 2016) (discussing the same statutory sections in the context of wire and mail fraud).

Defendant objects to the money judgment on two grounds. First, Defendant argues that a personal money judgment cannot be entered against her because of the Supreme Court's recent decision in *Honeycutt v. United States*. Second, Defendant argues that the requested $1,071,425.95 money judgment is not supported by the evidence adduced at trial. The Court addresses each argument in turn.

///

///

---

[2] Though 18 U.S.C. § 981 is a civil forfeiture statute, 28 U.S.C. § 2461(c) allows the Government to pursue criminal forfeiture for offenses, including Defendant's conviction under 18 U.S.C. § 666, previously subject only to civil forfeiture under § 981.

A. *Honeycutt v. United States*

Analogizing to the Supreme Court's decision in *Honeycutt v. United States*, Defendant first argues that no personal money judgment should issue because there is no statutory authority explicitly supporting or authorizing the money judgment against her. Def. Opp'n at 5, 9. According to Defendant, such a judgment is unlawful because it would be enforceable solely against future assets or income, which are "untainted and unrelated to the criminal charges at issue in this case." *Id.* at 4. As Defendant acknowledges, this Court was previously presented with and rejected this argument in *Ford*, 296 F.Supp. 3d at 1251. The Court will not depart from that decision here.

Prior to *Honeycutt,* it was well-established in this jurisdiction that courts are required to impose money judgments on criminal defendants under certain circumstances. In *Casey*, for example, the Ninth Circuit explained that courts are required to impose *in personam* money judgments against criminal defendants to ensure that they do not profit from their criminal activity:

> Requiring imposition of a money judgment on a defendant who currently possesses no assets furthers the remedial purposes of the forfeiture statute by ensuring that all eligible criminal defendants receive the mandatory forfeiture sanction Congress intended and disgorge their ill-gotten gains, even those already spent.

444 F.3d at 1074. The *Casey* court elaborated that the punitive nature of forfeiture is fulfilled by permitting the seizure of future assets. *Id*. (citing *United States v. Hall,* 434 F.3d 42, 59 (1st Cir. 2006)).

In *Honeycutt*, the Supreme Court considered "whether, under § 853, a defendant may be held jointly and severally liable for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." 137 S. Ct. at 1630. The Court held that such liability was "inconsistent with the statute's text and structure." *Id. Honeycutt* involved the defendant

7 – OPINION & ORDER

Terry Honeycutt and his brother Tony Honeycutt, who were selling iodine-based water-purification products out of Tony's hardware store that could be used in the manufacture of methamphetamine. *Id*. Tony's store grossed approximately $400,000 over a three-year period from sale of the water-purification products. *Id*. Pursuant to 21 U.S.C. § 853(a)(1), which provides for the forfeiture of any proceeds obtained as the result of the charged crime, the government sought forfeiture money judgments against both brothers totaling the store's profits from sales of the filters. Tony pleaded guilty and agreed to forfeit $200,000. *Id*. Terry went to trial and was found guilty of conspiracy to distribute the iodine. *Id.* The trial court declined to impose a money judgment against Terry and found that he had no controlling interest in the store and did not actually benefit from the sale of the filters. *Id.* at 1631. The Sixth Circuit reversed, concluding that, as co-conspirators, the brothers were jointly and severally liable for the proceeds of the conspiracy. *Id.*

The Supreme Court reversed the Sixth Circuit, holding that § 853(a) limits forfeiture to the tainted property and does not reference joint and several liability, which would require forfeiture of untainted property. *Id*. at 1632. Importantly, the Court construed the use of the term "obtained" to support its conclusion that § 853(a) "defines forfeitable property solely in terms of personal possession or use." *Id*. In other words, the use of the term "obtain" requires that the defendant actually obtain the forfeitable property. *Id*. Furthermore, the Court found that reading joint and several liability into the statute would nullify another provision of the statute, § 853(p), which delineates five conditions under which untainted substitute property shall be forfeited. *Id*. at 1633–34 (citing 21 U.S.C. § 853(p)). Thus, the Supreme Court looked at the plain text of § 853 to conclude that Congress intended only § 853(p) to deal with untainted assets and the statute did not contemplate otherwise imposing joint and several liability. In reaching this

conclusion, the Court held: "Forfeiture pursuant to § 853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime." *Id.* at 1635 (internal citations omitted).

As in *Ford*, Defendant here argues that *Casey* and its progeny cannot survive *Honeycutt*. Def. Opp'n 4. Essentially, Defendant interprets *Honeycutt* as standing for the proposition that forfeiture can only be sought against the tainted property itself or substitute property under § 853(p). By contrast, an *in personam* money judgment against a criminal defendant that could reach future untainted assets is not within the plain text of forfeiture statutes and is prohibited. *Id.* at 4–9.

As this Court previously held, "*Honeycutt's* holding is not as broad as Defendant claims" and "is factually and legally distinguishable from the present case." *Ford*, 296 F.Supp. 3d at 1257. To read *Honeycutt* as prohibiting a money judgment in the present case would allow criminal defendants to "benefit from their ill-gotten gains simply by spending their proceeds or otherwise putting them beyond the government's reach." *Id.* at 1257–58. The holding in *Honeycutt* does not demand such a result or "espouse a broad rule categorically barring *in personam* money judgments." *Id.* at 1258. "[R]ather, it prohibited the Government from imposing an *in personam* money judgment against a co-conspirator who never received or possessed the profits of his crimes." *Id.* In this case, the Court is persuaded that the Government has established by a preponderance of the evidence that Defendant possessed the proceeds of her crimes of conviction. Because Defendant possessed the proceeds of her crimes, it is proper for the Government to seek a money judgment against Defendant pursuant to well-established case law in this circuit and elsewhere permitting personal money judgments against criminal defendants.

B. Evidence at Trial

Defendant also argues that the sought-after money judgment is not supported by the trial evidence.[3] Def. Opp'n 9. Specifically, Defendant argues that all or part of the judgment sought by the Government should be reduced under 18 U.S.C. § 666(c) as "bona fide expenses." Those alleged bona fide expenses include health care costs, salary, three loans, and rental payments for the use of Defendant's home. Def. Opp'n 9–11.

Section 666(c) provides: "[t]his section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." Thus, 18 U.S.C. § 666 is not intended to apply to "acceptable commercial and business practices" or to other "legitimate" or "acceptable" practices. *United States v. Harloff*, 815 F. Supp. 618, 619 (W.D.N.Y. 1993).

Generally, "[w]hether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide." *United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007). A few courts, however, have assessed whether allegedly illegal monetary transactions constitute bona fide wages earned or expenses made in the usual course of business. In doing so, courts have emphasized different facts, including the actions and behavior of the defendant, how the money was spent, and whether the defendant was entitled to the money. *See United States v. Lupton*, 620 F.3d 790, 801–02 (7th Cir. 2010) (affirming the district court's determination that a payment did not fall within the exception under § 666(c) because the defendant's "unusual maneuvering . . . reveal[ed] that this was not to be a payment in the ordinary course of

---

[3] Here, Defendant also argues that because 18 U.S.C. § 666 only required the jury to find conversion of $5,000 per year, the verdict supports "nothing more" than a judgment of $25,000. Def. Opp'n 9. However, if anything, the verdict sheds doubt on Defendant's argument that she owes nothing because of all her expenses should be offset as bona fide expenses under 18 U.S.C. § 666(c)

10 – OPINION & ORDER

business"); *United States v. Cornier-Ortiz*, 361 F.3d 29, 36–37 (1st Cir. 2004) (finding "payments made for what was an underlying legitimate purpose but intentionally misapplied to undermine a conflict of interest prohibition" were not bona fide); *United States v. Bryant*, 556 F. Supp. 2d 378, 427 (D.N.J. 2008) (payments did not count as bona fide salary paid in the usual course of business where the payments were compensation for the defendant's undisclosed role "as a legislator on the take," rather than work pursuant to his publicly disclosed job description); *see also United States v. Williams*, 507 F.3d 905, 908–09 (5th Cir. 2007) (describing various cases demonstrating "that a salary is not bona fide or earned in the usual course of business under § 666(c) if the employee is not entitled to the money"). For example, the Ninth Circuit in *United States v. Paul* found that 18 U.S.C. § 666(c) was inapplicable where the defendant "may have been entitled to overtime compensation" but "admittedly misappropriated the funds in an unauthorized manner and thus did not receive bona fide wages in the ordinary course of business." 239 Fed. App'x 353, 354 (9th Cir. 2007).

Turning first to Defendant's compensation, the Court finds that the money judgment should be reduced by $46,190.62, representing health costs that GUTD paid for Defendant. Both parties agree that the health payments made to Blue Cross, Regence, Willamette Dental, and other medical providers—which occurred on a fairly regular basis and were made directly to those providers—are bona fide compensation within the meaning of § 666(c). Therefore, these expenses are not proceeds of Defendant's crime. *See* Trial Exs. 333–37, 1044; Gadawski Tr. 77:15–24, ECF 175-1.

The Court finds, however, that Defendant is not entitled to an offset for her purported salary. As Defendant points out, there are documents in the record demonstrating that the GUTD Board of Directors agreed to pay Defendant $90,000 per year as the director of GUTD. Trial Ex.

1006. But it is obvious at least one of the relevant documents was a forgery. There are no W-2s, paystubs, regular checks, or ledgers documenting Defendant's payroll. *See* Gov't Reply 3–4, ECF 148. Defendant, as the director of GUTD and with control over GUTD finances, spent money directly from the GUTD account and comingled legitimate expenses with illegitimate expenses, making it impossible for the Court to ascertain whether any expenses constitute bona fide salary. As director, she also transferred money at will between the GUTD account and her personal account. Thus, while Defendant may have been entitled to this compensation for her legitimate work as director of GUTD, there are no payments in the record that can reasonably be characterized as bona fide and paid in the usual course of business.

The loans and rent payments Defendant seeks to deduct are also not bona fide expenses made in the usual course of business. First, there is no evidence that the personal home refinance loan in the amount of $106,764.64 was provided to GUTD. Instead, there is only a statement from 2007 reflecting the deposit of the loan amount that also indicates most of the funds were removed by Defendant five days later. Trial Ex. 1011. Defendant has not produced any contemporaneous agreement evidencing the loan. Instead, the loan is mentioned in documents created years later suggesting that Defendant had loaned $103,000—not $106,764.64—to GUTD from the refinance of her home. Trial Exs. 1006, 1007. In addition, as admitted by Defendant's own financial expert, it is impossible for the Court to tell what payments—if any—were intended to be repayments on the loan. Gadawski Tr. 81:8–11 ("Frankly, given the reports and the way money was taken out of the company, it's impossible to tell what money was used to repay that loan or when the loan was actually repaid."). Given this lack of contemporaneous evidence and inconsistencies in the record, the Court finds that this was not a bona fide loan made in the usual course of business by Defendant to GUTD.

Likewise, there is no evidence to support Defendant's contention that she made a loan to GUTD using $49,115.58 that she withdrew from her PERS account in 2004. Trial Exs. 1013–14. There are no contemporaneous documents evidencing such a loan between Defendant and GUTD. The earliest documentary evidence of the alleged a loan is from 2009—five years after the disbursement of the funds—and suggests that the loan was $90,000, significantly more than the actual PERS distribution. Trial Ex. 1006. In addition, the contemporaneous evidence in the record suggests that the PERS withdrawal was requested by Defendant "[d]ue to personal illness and the future foreclosure on [her] home." Trial Ex. 100 at 34. Thus, there is no credible evidence to support Defendant's suggestion that this loan existed or was made in in the usual course of business.

The Court also declines to offset the money judgment by $120,000 for the loan from Mr. Cabrera. Though there are documents suggesting Defendant personally obtained the loan from Mr. Cabrera and then loaned that money to GUTD, Trial Ex. 1008–09, disbursement of the funds went directly to GUTD and all three of the loan payments were made from the GUTD bank account, Trial Exs. 77 at 160, 248, 303; 218. There is no evidence Defendant was held personally responsible for the remainder of the loan. Without more, the Court cannot find that this is a bona fide loan made by Defendant to GUTD in the usual course of business.

Finally, Defendant is not entitled to an offset for rent in the amount of $175,000. Though the board of directors authorized Defendant to collect rent for the use of her home in GUTD activities beginning in 2009, Defendant's home was not used for the approved purposes of "shelter, extreme case behavior children, meetings, child transportation and dispatch, and office space" during the period in question. Trial Ex. 1005. Indeed, Mercedes Garcia testified that between 2011 and 2015 Defendant did not care for any foster children in her home or take

meetings in her home. No staff worked there. In addition, Defendant made home mortgage payments directly from the GUTD account that conflict with the terms of the rental agreement, both in timing and amount. For example, Defendant was authorized to collect $2,850 per month to be paid in the form of a personal check, cashier's check, or money order made out to Defendant on the first of the month. Trial Ex. 1005. But the GUTD funds in question went directly to Defendant's mortgage company, were upwards of $3,500 per month, and were paid out at varying times during the month. *See* Trial Ex. 340 (summary chart of mortgage payments). Consequently, the Court finds that there are no rental payments that should be deducted as bona fide expenses made in the usual course of business.

Turning to the Government's evidence, the Court finds that the Government has demonstrated that the judgment sought otherwise represents the money Defendant obtained as proceeds of her convictions under of 18 U.S.C. § 666. The Government excludes from the judgment over $250,000 in cash withdrawals because they are untraceable. Gov't Mot. 4 n.2. The requested money judgment is based solely on funds that were either directly transferred from the GUTD account to Defendant's personal account or paid directly from the GUTD account. As the affidavit of Agent Swansinger and evidence at trial demonstrate, these funds were spent on various personal items and endeavors, including DTUG, Mary's Fish and Ribs, payments on the MLK property, home improvement costs, restaurants, travel, and retail. *See* Swansinger Aff. ¶¶ 4–10, ECF 132-1; Trial Ex. 356.

As Mr. Gadawski testified, some portion of these costs may not have been exclusively personal. *See e.g.* Gadawksi Tr. 59:5–60:12. However, "[t]he Government is not required to prove the illegitimacy of each and every transaction in a fraudulent scheme when there is evidence that supports the reasonable inference as to the method of the scheme." *United States v.*

*Harris*, CR No. 17-00001 HG-1, 2018 WL 6184878, at * 10 (D. Haw. Nov. 27, 2018) (citing *United States v. Elder*, 682 F.3d 1065, 1073 (8th Cir. 2012)). Here, Defendant extensively co-mingled her personal expenses with GUTD finances, wielded complete control over GUTD accounts and finances, spent money directly from the GUTD account, and transferred money between both accounts at will, ultimately allowing her to conceal her theft and making it difficult for the Court to review the legitimacy of each transaction. Under these circumstances, it is reasonable to infer the purported transactions were illegitimate. Accordingly, the Court finds that the Government has shown by a preponderance of the evidence that $1,025,235.33 represents the amount Defendant stole from GUTD in violation of 18 U.S.C. § 666.

## II. Specific Asset Forfeiture

The Government seeks specific asset forfeiture of $364.01 and $451,006.95 related to the sale of the MLK property.[4] Like the money judgment, specific asset forfeiture is governed by § 981(a)(1)(C), which subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" theft concerning programs receiving federal funds under 18 U.S.C. § 666.

The Court finds that the $451,006.95 and $364.01 from the sale of the MLK property are derived from proceeds traceable to Defendant's violation of 18 U.S.C. § 666.[5] A total of

---

[4] The Government also seeks forfeiture of $20,000, representing a $20,000 cashier's check from the GUTD bank account that went toward the down payment on the MLK property, as part of Defendant's conviction for money laundering under 18 U.S.C. § 1956. This is an "alternate and overlapping theory of forfeiture." Gov't Mot. 15. As the Court has concluded that the full $451,006.95 is forfeitable under § 981(a)(1)(C), it need not reach this separate forfeiture theory.
[5] After Defendant purchased the MLK Property in 2013 and had to transfer the property back to the sellers as part of a settlement, MLK Property Group, a business entity controlled by Defendant, purchased the MLK property on September 2, 2016. Gov't Mot. 4–6; Swansinger Aff. ¶¶ 11–12. Four days later, the MLK Property Group sold the property to Dozer Construction. Swansinger Aff. ¶ 12. At closing, Dozer Construction paid a total of $73,355.58, which was deposited into the MLK Property Group's bank account, and owed an additional

15 – OPINION & ORDER

$138,671.76 in payments were made on the MLK property, which was not used for GUTD activities. All of these payments can be traced to Defendant's theft of funds from GUTD.

First, Defendant made $107,705.49 in payments on the MLK property directly from the GUTD account, including payments on the loan balance and an additional $30,000 as part of a settlement agreement with the sellers for payments owed. Gov't Mot. 6 (citing Trial Ex. 304-2); Swansinger Aff. ¶ 16.

Second, Agent Swansinger links transfers or deposits from the GUTD account to Defendant's personal account with the remainder of the payments made from Defendant's personal account on the MLK Property. *See* Swansinger Aff. ¶ 17. For example, after Defendant transferred $91,000 from the GUTD account to her personal account on March 26, 2014, she made two payments of $5,813.09 on April 3 and May 5, 2014. Similarly, on July 8, 2014, Defendant made a $4,813.00 payment toward the MLK property five days after cashing a $6,000 check from the GUTD account. Again, on August 4, 2014, Plaintiff withdrew $7,500 from the from the GUTD account and made three $2,500 deposits into her own account. The next day, she made a $4,814.00 payment on the MLK property. On September 4, 2014, Defendant deposited an $8,000 check from the GUTD account into her own account and made a $4,813.09 payment. Finally, on October 3, 2014, there was a $5,500 withdrawal from the GUTD account and a cash deposit of $5,500 in Defendant's personal account. Three days later, Defendant made one last $4,900.00 payment on the MLK property from her personal account. Thus, there is a strong temporal connection between illegitimate withdrawals from the GUTD account, deposits into Defendant's personal account, and subsequent payments on the MLK property. While Defendant

---

$390,000. *Id.* at ¶¶ 13–14. The $364.01 represents the money left in the bank account at the time the Government seized the account. *Id.* at ¶ 19. The $451,006.95 represents the amount owed (including interest) on the Note. *Id.* at ¶ 21.

16 – OPINION & ORDER

may have intended some of these checks to constitute payment of wages, *see* Swansinger Aff. ¶ 17(c), (e), none of the payments can reasonably be characterized bona fide compensation paid in the usual course of business as further described above. Based on this evidence, it is more likely than not that all the payments on the MLK property are traceable to funds stolen from GUTD. Accordingly, the revenue from the sale of the property is subject to forfeiture.

In opposition, Defendant argues that a substantial portion of the payments came from "authorized funds" such that a substantial portion of the proceeds from the sale of the MLK property remain the property of Defendant. Def. Opp'n 12. To support her argument, Defendant's expert, Mr. Gadawski, estimated what portion of expenses in a given year "authorized" by adding together Defendants health benefit expenses and $90,000 annual salary. Gadawksi Decl. ¶¶ 11–20, ECF 145–2. He then multiples the percentage of authorized expenditures by the total payments made on the MLK property that same year. *Id.* According to Defendant, this represents the amount of the payment that comes from "untainted funds." *Id.* To illustrate, Defendant estimates she was owed $99,523.06 in health benefits and salary in 2012. *See* Def. Opp'n Ex. 3, ECF 145–3. This represents 33.84% of her total unauthorized expenditures that year. *Id.* She made one $5,000 payment on the MLK property in 2012. *Id.* According to Defendant, $1,691.98 (33.84% of $5,000) of this payment is "untainted" or authorized. *Id.* Using this method for each year in which there were payments, Defendant estimates that 42.78% percent of the payments made on the property were authorized, and Defendant is therefore entitled to 42.78% ($150,973.40) of the revenue received for the sale of the property. *Id.*

This Court disagrees. First, Defendant overestimates what portion of the payments on the MLK property were "authorized" because the estimate includes funds that were paid directly to

health care companies and could not have been used to purchase the MLK property. Second, Defendant fails to trace any of the specific payments made on the property to bona fide or untainted funds, and Defendant's salary was not bona fide and paid in the usual course of business. Particularly in light of the Government's evidence, Defendant's speculative allocation of funds does not make it any less likely that the revenue from the sale of the MLK property is traceable to or derived from proceeds of Defendant's crime.

In sum, the Government provides compelling evidence linking the payments made on the MLK property to the proceeds of Defendant's theft from GUTD. Based on this evidence, it is more likely than not that this property was purchased solely with stolen funds and the revenue from the sale of the property is derived from proceeds forfeitable under § 981(a)(1)(C). Accordingly, the Government is entitled to specific asset forfeiture $364.01 and $451,006.95.

### III. Substitute Asset Forfeiture

The Government also seeks forfeiture of substitute assets under 21 U.S.C. § 853(p) if the specific assets discussed above are not forfeitable. Gov't Mot. 15. Section 853(p) governs substitute asset forfeiture.[6] It provides:

(1) Paragraph (2) of this subsection shall apply, if any property described in subsection (a), as a result of any act or omission of the defendant—

    (A) cannot be located upon the exercise of due diligence;

    (B) has been transferred or sold to, or deposited with, a third party;

    (C) has been placed beyond the jurisdiction of the court;

    (D) has been substantially diminished in value; or

    (E) has been commingled with other property which cannot be divided without difficulty.

---

[6] 28 U.S.C. § 2461(c) incorporates the forfeiture procedures in 21 U.S.C. § 853 to "all stages of a criminal forfeiture proceeding," including forfeiture under 18 U.S.C. §§ 981 and 982.

18 – OPINION & ORDER

(2) In any case described in any of subparagraphs (A) through (E) of paragraph (1), the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in subparagraphs (A) through (E) of paragraph (1), as applicable.

21 U.S.C. § 853(p).

At this juncture, the Court declines to grant the Government's request for substitute asset forfeiture. As described above, the Court has already determined that these assets are forfeitable as specific assets.[7] Accordingly, the Government's request for substitute asset forfeiture is denied.

## CONCLUSION

The Government's Motion for Entry of a Preliminary Order of Forfeiture [132] is GRANTED in part and DENIED in part. The Court will enter a personal money judgment against the Defendant in the amount of $1,025,235.33 and order the forfeiture of the $364.01 seized from Bank of America and $451,006.95 from Fidelity National Title Company. The Government shall submit a proposed preliminary order of forfeiture for the Court's signature by the date of sentencing.

IT IS SO ORDERED.

Dated this \_\_\_18\_\_\_ day of \_\_\_June\_\_\_, 2019.

_____
MARCO A. HERNÁNDEZ
United States District Judge

---

[7] The Court notes, however, that the Government may still seek forfeiture substitute assets should it discover any at a later date. Fed. R. Crim P. 32.2(e)(1)(B) (allowing the Government to move to amend an existing forfeiture order to include property that "is substitute property that qualifies for forfeiture under an applicable statute.").

19 – OPINION & ORDER